ORDERED.

**Dated:  June 28, 2021**

Caryl E. Delano
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                                      Case No. 8:19-bk-09946-CED
                                                                               Chapter 11

Heritage Hotel Associates, LLC,

              Debtor.

_____/

## MEMORANDUM OPINION SUSTAINING, IN PART, DEBTOR'S OBJECTION TO CLAIM NO. 35 OF CCP SP HOTEL, LLC

THIS CASE came before the Court on February 9 and 10, 2021, for trial of *Debtor's Objection to Claim No. 35 Filed by CCP SP Hotel, LLC*.[1] On March 3, 2021, counsel for the parties presented their closing arguments.

Under Federal Rule of Bankruptcy Procedure 3001(f), a properly filed proof of claim constitutes prima facia evidence of the validity and amount of the claim.[2] If the

_____

[1] Doc. No. 330.
[2] Fed. R. Bankr. P. 3001(f).

objecting party overcomes the prima facie case, then the burden of proof falls to the party that would bear the burden outside of bankruptcy.[3]

## I.    BACKGROUND

The debtor in this Chapter 11 case, Heritage Hotel Associates, LLC ("Heritage"), previously owned a Hotel Indigo in St. Petersburg, Florida (the "Hotel") and an adjoining property (the "Retail Parcel"). Heritage's primary creditor was Valley National Bank ("Valley"), the holder of a promissory note secured by a mortgage on the Hotel and the Retail Parcel (the "Heritage Loan").

As described below, CCP SP Hotel, LLC ("CCP") acquired Valley's claims and filed Claim 35 (the "CCP Claim") to amend and update the proofs of claim filed by Valley. The CCP Claim consists of three components:  the Heritage Loan; a claim for a junior mortgage on the Hotel ("the Glover Mortgage"); and a claim for overdrafts in Heritage's deposit accounts at Valley (the "Overdraft Claims").

Heritage objected to the CCP Claim (the "Objection").[4] The issues before the Court on the Objection are (a) the amount due on the Heritage Loan, including whether CCP is entitled to default interest and the reimbursement of attorney's fees and costs; (b) the amount due on the Glover Mortgage; and (c) whether the Overdraft Claims are secured or unsecured claims.

---

[3] *Raleigh v. Illinois Department of Revenue*, 530 U.S. 15, 20, 120 S. Ct. 1951, 147 L. Ed. 2d 13 (2000); *In re Walston*, 606 F. App'x 543, 546 (11th Cir. 2015).
[4] Doc. No. 330.

### A.      The Heritage Loan

In 2008, Valley's predecessor, USAmeriBank,[5] made a loan to Heritage documented by a promissory note in the amount of $7,284,000.00 (the "2008 Note")[6] and a mortgage on the Hotel and the Retail Parcel (the "Heritage Mortgage").[7] The Heritage Loan was modified at least four times, most recently in 2014, when Heritage executed a Modification Promissory Note (the "2014 Note") and related agreements.[8] Together, the original and modified loan documents are referred to as the "Heritage Loan Documents." The Heritage Loan was personally guaranteed by Heritage's three principals, Norman Giovenco, George Glover, and Ford Smith (the "Guarantors").[9]

The 2014 Note includes the following relevant provisions:

1.      Heritage shall make monthly payments of principal and interest commencing on October 14, 2014, as set forth on an attached schedule (the "2014 Amortization Schedule").[10] After August 14, 2017, interest on the 2014 Note accrued at the greater of 5.5% or the average of a defined interest swap rate[11] plus 3.25%.

---

[5] Valley is the successor by merger to USAmeriBank (Heritage's Ex. 111.r, Doc. No. 487-19).
[6] CCP's Ex. 1, Doc. No. 468-1.
[7] CCP's Ex. 2, Doc. No. 468-2.
[8] CCP's Exs. 23, 24, and 25, Doc. Nos. 468-23, 468-24, and 468-25.
[9] *See* CCP's Exs. 4, 5, 6, 26, 27, and 28, Doc. Nos. 468-4, 468-5, 468-6, 468-26, 468-27, and 468-28.
[10] CCP's Ex. 24, Doc. No. 468-24, pp. 7-8.
[11] The swap rate is defined as the International Swaps and Derivatives Association mid-market par swap rates for 3-year interest rate swaps as reported in the Federal Reserve Statistical Release H.15, Selected Interest Rates (Daily) on the last Business Day immediately prior to August 14, 2017 (CCP's Ex. 24, Doc. No. 468-24, p. 2).

2.      Daily interest was to be computed on the basis of a 360-day year for the actual number of days elapsed, and any payment on the 2014 Note "shall be applied first to accrued and unpaid interest, second to principal and the balance, if any, to unpaid fees."[12]

3.       Lender was entitled to a late charge equal to 5% of the unpaid amount of the late payment if Heritage failed to make a payment within ten days of its due date, as long as Lender had not exercised its right to accelerate the loan balance.[13]

4.      The term "Event of Default" is defined as including the "non-payment within ten (10) days of the date due of any interest or principal." In the Event of Default, Lender, at its option "and without notice (*Borrower hereby expressly waives notice of default*)," could accelerate the 2014 Note and declare the entire principal balance immediately due and payable, together with accrued interest and fees.[14] This provision of the 2014 Note differs from the 2008 Note, which required that Heritage be given ten days' notice to cure any default.[15]

5.      The maturity date was July 2, 2020.[16]

6.      Upon maturity or default, the 2014 Note bears interest at the "highest rate permitted under then applicable law."[17]

---

[12] CCP's Ex. 24, Doc. No. 468-24, p. 3.
[13] *Id.*, p. 5.
[14] *Id.*, p. 4 (emphasis added).
[15] CCP's Ex. 1, Doc. No. 468-1, p. 4.
[16] CCP's Ex. 24, Doc. No. 468-24, p. 3.
[17] *Id.*, p. 4.

7.      Finally, the 2014 Note provides that no failure or delay by Lender in exercising its rights operates as a waiver.[18]

**B.      The Glover Mortgage**

In 2011, one of Heritage's principals, George Glover, obtained two loans from USAmeriBank, one for $150,000.00 and another for $125,000.00 (together, the "Glover Notes").[19] In June 2016, Mr. Glover, USAmeriBank, and Heritage's two other principals entered into a settlement agreement to resolve a number of outstanding issues (the "Settlement Agreement").[20] Under the Settlement Agreement, Heritage executed a promissory note to Mr. Glover in the amount of $270,000.00 to memorialize loans that Mr. Glover had previously made to Heritage (the "Glover Heritage Note")[21] and a junior mortgage on the Hotel as security for the Glover Heritage Note (the "Glover Mortgage").[22]

Under the Settlement Agreement, Mr. Glover executed an Assignment of Loan Documents (the "Glover Assignment"),[23] in which he assigned the Glover Heritage Note and the Glover Mortgage to USAmeriBank "as additional collateral" for the

---

[18] *Id.*
[19] Heritage's Exs. 111.k and 111.m, Doc. Nos. 487-12 and 487-14.
[20] Heritage's Ex. 111.r, Doc. No. 487-19.
[21] Heritage's Ex. 111.t, Doc. No. 487-21, pp. 2-6.
[22] *Id.*, pp. 7-17.
[23] *Id.*, pp. 18-26.

Glover Loans.[24] The Glover Assignment does not state whether it is an "absolute" assignment or a "collateral" assignment.[25]

### C.     Heritage's Bankruptcy Case

On October 21, 2019 (the "Petition Date"), Heritage filed a Chapter 11 bankruptcy case.[26] In its bankruptcy schedules, Heritage listed the Hotel valued at $8,960,000.00 and the adjacent Retail Parcel valued at $720,000.00.[27]

### 1.     The Proofs of Claim

The deadline for filing proofs of claim in the Chapter 11 case was February 3, 2020 (the "Claims Bar Date").[28] On the Claims Bar Date, Valley, as successor in interest to USAmeriBank, timely filed four proofs of claim (the "Valley Claims"):[29]

**Claim 27**, a secured claim in the amount of $6,298,573.08, representing the balance due on the Heritage Loan, including principal of $5,642,281.86, accrued interest and attorney's fees as of February 3, 2020, and late charges. In Claim 27, Valley

---

[24] CCP's Ex. 37, Doc. No. 469-7.

[25] Generally, an assignee under a collateral assignment only has the right to receive payments, whereas an assignee under an absolute assignment also has the right to enforce other provisions of the assigned contract. *St. Francis Holdings, LLC v. Pawnee Leasing Corp.*, 2020 WL 6746329, at *3 (M.D. Fla. Nov. 17, 2020).

[26] Heritage's stated purpose for filing Chapter 11 was to sell the Hotel and Retail Parcel free and clear of all liens, claims, and interests—as is authorized by the Bankruptcy Code—and to pay all allowed claims in full. Prior to filing its bankruptcy case, Heritage had been stymied in its efforts to sell its property because of state court litigation and a notice of lis pendens filed by a third party, Ping Pong Partners, LLC (Doc. No. 4, § III).

[27] Doc. No. 35, p. 7.

[28] Doc. No. 12.

[29] A fifth proof claim filed by Valley, Claim 28, is not at issue here.

stated that the "present fair market value" of its collateral—the Hotel[30]—was \$10.5 million;

**Claim 29**, a secured claim in the amount of \$415,356.40, representing the balance due on the Glover Mortgage that Mr. Glover had assigned to USAmeriBank; and

**Claim 30** and **Claim 31**, filed as *unsecured* claims in the amounts of \$64,030.42 and \$19,533.00, respectively, representing amounts for overdrafts in Heritage's deposit accounts at Valley.

In addition, the Small Business Administration (the "SBA") timely filed a proof of claim (Claim 32) asserting a mortgage lien on the Hotel (junior to the Heritage Mortgage) in the amount of \$554,636.52 (the "SBA Mortgage"). The attachments to Claim 32 include a Third Party Lender Agreement executed by USAmeriBank (the "Third Party Lender Agreement"), discussed in more detail below.

### 2. Significant Events in the Bankruptcy Case

On January 9, 2020, Heritage sold the Retail Parcel to a third party, Fit2Run, LLC.[31] The net proceeds of the sale, \$695,590.33 (the "Retail Proceeds"), were paid to

---

[30] Valley filed Claim 27 on February 3, 2020, *after* Heritage closed on the sale of the Retail Parcel, the other collateral for the Heritage Loan.

[31] Doc. No. 112. The Court's order authorizing the sale was entered on December 20, 2019 (Doc. No. 86).

Valley.[32] Valley applied the Retail Proceeds, first, to the contractual interest then due on the Heritage Loan, and then to reduce the unpaid principal balance.[33]

On January 27, 2020, the Court entered an order confirming Heritage's Chapter 11 Plan (the "Confirmation Order").[34] Under the Confirmation Order, Heritage was to close on a sale of the Hotel to a third party in February 2020. However, on January 29, 2020, the third party terminated the purchase and sale agreement and the sale did not close.[35]

Shortly thereafter, Debtor filed a motion to modify its confirmed Plan (the "Plan")[36] to extend the maturity date of the Heritage Loan to December 31, 2020.[37] In April 2020, Heritage filed an amended motion to modify the Plan (the "Plan Modification Motion").[38] In the Plan Modification Motion, Heritage sought to modify the Plan to, *inter alia*, accrue interest on the Heritage Loan at the contract rate of 5.5% per annum, to make no payments to Valley until the Hotel was operating on a positive cash flow basis, and to extend the maturity date of the Heritage Loan to December 2, 2021.[39] Heritage also disclosed that it had entered into a purchase agreement with

---

[32] Doc. No. 112. The Retail Proceeds have been referred to in this case as the "Fit2Run Proceeds."
[33] Doc. No. 471, p. 3.
[34] Doc. No. 117.
[35] Doc. No. 121, ¶ 3.
[36] Doc. No. 66.
[37] Doc. No. 121, ¶ 7.
[38] Doc. No. 144.
[39] *Id.*, ¶ 10.

Liberty DTSP, LLC ("Liberty") in March 2020, but that Liberty had terminated the agreement prior to the expiration of its due diligence period.[40]

On June 9, 2020, CCP filed a notice[41] that Valley had transferred the Valley Claims to CCP pursuant to a June 5, 2020 Sale & Assignment Agreement (the "Claim Assignment").[42]

On July 28, 2020, Heritage filed a motion for approval of bid procedures (the "Bid Procedures Motion") in connection with an offer to purchase the Hotel that it had received from Ally Capital Group, LLC ("Ally").[43] The sale process was contentious, with CCP raising numerous objections.[44] But on September 28, 2020, with Court approval and over CCP's objections, Heritage sold the Hotel for $8 million, an amount sufficient to pay all claims secured by the Hotel in full (the "Ally Sale").[45] The Court authorized the closing agent to pay the SBA's claim in full and to pay CCP the undisputed portion of its secured claim, which the Court determined to be $5,475,058.35.[46]

---

[40] *Id.*, ¶¶ 4-5.
[41] Doc. No. 197.
[42] Heritage's Ex. 111.r, Doc. No. 487-10.
[43] Doc. No. 245.
[44] *See* Doc. Nos. 252, 255, 261, 270, 277, 287, 304, 308, 317, 332, and 342.
[45] Doc. Nos. 304 and 358.
[46] Doc. Nos. 304 and 325.

### 3.    Valley's Claim for Default Interest and Attorney's Fees

Meanwhile, in February 2020, Valley had filed an application for payment of postpetition interest and attorney's fees (the "Default Interest Application").[47] In the Default Interest Application, Valley asserted that as a fully secured creditor, it was entitled to payment of postpetition interest and attorney's fees under 11 U.S.C. § 506(b);[48] that Heritage had defaulted in making payments to Valley; and that under the 2014 Note, Valley was entitled to default interest on its unpaid loan balance at the maximum rate allowed by law, stated by Valley to be 24%.[49]

Heritage did not contest Valley's entitlement to its postpetition attorney's fees, but objected to Valley's claim for default interest, in part on the ground that Valley had not demanded default interest in its prior course of dealing with Heritage.[50]

At a hearing on May 20, 2020, the Court announced its oral ruling on the Default Interest Application.[51] First, the Court ruled that because Heritage had not objected to Valley's request for attorney's fees, the Court would allow them as requested in the amount of $23,678.51.[52] Second, the Court held that under Florida law, a lender has the right to charge default interest if it is provided for in the

---

[47] Doc. No. 119.
[48] Valley claimed $23,678.51 in attorney's fees as of February 3, 2020 (Doc. No. 119, ¶ 18).
[49] Under Fla. Stat. §§ 687.02(1) and 687.071, the highest rate permitted for loans in excess of $500,000.00 is 25% per annum.
[50] Doc. Nos. 142 and 159.
[51] Doc. No. 192, May 20, 2020 Hearing Transcript.
[52] Doc. No. 171, p. 4.

underlying loan documents, and Florida courts "may not alter the lender's contractual right to default interest based on equitable consideration."[53]

On Heritage's argument that Valley's course of dealing precluded it from asserting a claim for default interest, the Court found, first, the 2014 Note provides for default interest if Heritage defaulted in monthly payments; second, Heritage had failed to make the monthly payments starting with the payment due for September 14, 2019; third, under the 2014 Note, Heritage had waived notice of default; fourth, Heritage had actual notice of Valley's assertion of its right to default interest through December 2019 communications from Valley's attorney and Valley's Claim 27 filed on February 3, 2020; and fifth, the 2014 Note specifically provides that Valley's delay in exercising its rights does not operate as a waiver of any rights under the Note.[54]

The Court concluded that Valley was entitled to default interest as provided for under the 2014 Note.[55] However, in its ruling, the Court did not calculate the dollar amount of the default interest due to Valley nor did the Court determine how Valley should apply the Retail Proceeds to the Heritage Loan.

At the conclusion of the Court's oral ruling, Heritage's attorney asked the Court to clarify whether it had considered the effect of Section 9.2 of Heritage's confirmed

---

[53] Doc. No. 192, May 20, 2020 Hearing Transcript, p. 17, ll. 10-17 (citing *In re Sundale, Ltd.*, 410 B.R. 101, 105 (Bankr. S.D. Fla. 2009)).

[54] Doc. No. 192, May 20, 2020 Hearing Transcript, pp. 9-12, 19-21.

[55] *Id.*, p. 22.

Plan, which Heritage contended effected a cure of the default in payments on the Heritage Loan.[56] The Court took the matter under advisement, and after consideration of Heritage's argument, entered its May 26, 2020 *Order Approving Valley National Bank's Application for Payment of Post-Petition Interest and Attorneys' Fees and Costs Pursuant to 11 U.S.C. § 506(b)* (the "Default Interest Order").[57] In the Default Interest Order, the Court analyzed the relevant provisions of the Plan and the Confirmation Order and concluded that the Confirmation Order specifically preserved Valley's right to claim default interest.

On June 4, 2020, Heritage timely filed a motion for reconsideration of the Default Interest Order (the "Reconsideration Motion").[58] In the Reconsideration Motion, Heritage asked the Court to reconsider the Default Interest Order for two reasons:  (a) to receive evidence of the parties' course of dealing, which Heritage claimed would show that Valley was not entitled to default interest, and (b) to consider whether the 2014 Note's default interest provision violates the Third Party Lender Agreement—an issue that Heritage had not previously raised.

---

[56] *Id.*, p. 24.
[57] Doc. No. 171.
[58] Doc. No. 180.

On June 8, 2020, CCP—having purchased the Valley Claims on June 5, 2020—filed an objection to the Reconsideration Motion.[59]

On August 18, 2020, the Court entered an order granting the Reconsideration Motion (the "Default Interest Reconsideration Order"), noting that the Default Interest Order was an interlocutory order, and holding that "a more developed record may support [Heritage's] position on the default interest issue."[60]

### 4.    CCP's Claim 35

At a hearing on September 1, 2020, CCP's counsel suggested that CCP file an amended proof of claim "that more comprehensively covers what our claim is." Heritage's counsel agreed that Heritage—which previously had objected only to Valley's Default Interest Application and not to the other components of Valley's Claim 27—would promptly file an objection.[61]

---

[59] Doc. No. 196. Counsel for CCP was already familiar with Heritage's bankruptcy case as he had previously represented an interested party in the case, Ping Pong Partners, LLC, in connection with its asserted claims to the Retail Parcel. (*See, e.g.,* Doc. Nos. 23, 24, 25, 53, 56, 71, 74, 76, and 84, and Adv. Pro. No. 8:19-ap-545-CED.)

[60] Doc. No. 291, p. 5. CCP filed a notice of appeal of the Default Interest Reconsideration Order (Doc. No. 320) and a motion for leave to appeal in the District Court. (The filing of the notice of appeal did not divest the Bankruptcy Court of jurisdiction over issues relating to CCP's claim in the bankruptcy case. *See In re Daufuskie Island Properties, LLC,* 441 B.R. 49, 55 (Bankr. D.S.C. 2010) (An appeal from a non-appealable order does not divest the lower court of jurisdiction.), and *In re Bergman*, 397 B.R. 348, 352 (Bankr. E.D. Va. 2008) (Interlocutory orders may be appealed only by permission of the district court, so the bankruptcy court retains the power to rule on the issues until the district court actually grants leave to appeal.))
On January 23, 2021, the District Court entered an order denying CCP's motion for leave to appeal and dismissed CCP's appeal of the Default Interest Reconsideration Order (Doc. No. 454).

[61] Doc. No. 328, September 1, 2020 Hearing Transcript, pp. 32-33.

The next day, CCP filed Claim 35 (the "CCP Claim") as an amendment to the Valley Claims. In the CCP Claim, CCP asserted a fully secured claim in the amount of $7,198,784.69 as of September 16, 2020, the date on which the Ally Sale was scheduled to close. The components of the CCP Claim are as follows:

**The Heritage Loan**

| | |
|---|---|
| Principal | $5,424,442.41 |
| Interest as of 09/16/20 at $3,616.29 per diem | $900,456.21 |
| Late charges | $75,058.35 |
| Valley appraisal fee | $4,284.00 |
| CCP appraisal fee | $12,700.00 |
| Valley legal fees | $123,604.00 |
| CCP legal fees | $121,625.50 |
| CCP costs | $4,866.15 |
| Oscher Consulting P.A. fees | $7,862.50 |
| **Total** | **$6,674,899.12** |

**The Glover Mortgage**

| | |
|---|---|
| Principal | $270,000.00 |
| Interest | $170,322.15 |
| **Total** | **$440,322.15** |

**The Overdraft Claims**

| | |
|---|---|
| Account #2004810 | $64,030.42 |
| Account #5000049127 | $19,533.00 |
| **Total** | **$83,563.42** |

Although Valley's Claims 30 and 31 stated the Overdraft Claims as *unsecured* claims, CCP asserts in the CCP Claim that, under the Heritage Loan Documents, the Hotel is security for "any additional indebtedness accruing to the Lender on account

of any future payments, advances or expenditures made by the Lender," and that the Overdraft Claims are *secured* claims.[62]

### 5.    Heritage's Objection to the CCP Claim

Heritage filed its Objection to the CCP Claim on September 10, 2020.[63] In the Objection, Heritage contests each line item of CCP's claim on the Heritage Loan (except the Valley appraisal fee), the amount claimed on the Glover Mortgage, and the secured status of the Overdraft Claims.

On September 23, 2020, the Court conducted a hearing on the Objection. As a result of the parties' agreement that the Court could rule without an evidentiary hearing on the issue of whether the Third Party Lender Agreement limited the amount of interest that could be charged on the Heritage Loan, the Court established a briefing schedule and scheduled a further hearing to announce its ruling.[64]

On October 27, 2020, after additional briefing by Heritage and CCP,[65] the Court delivered its oral ruling. The Court found that under the Third Party Lender Agreement, CCP's claim for default interest is capped at the maximum rate posted by the SBA in the Federal Register.[66] However, the Court deferred entering a written

---

[62] Doc. No. 505, pp. 13-16 (citing CCP's Ex. 2, Doc. No. 468-2, pp. 2, 7).
[63] Doc. No. 330.
[64] Doc. No. 353.
[65] Doc. Nos. 341, 364, and 375.
[66] Doc. No. 408, October 27, 2020 Hearing Transcript, pp. 20-21.

order until it determined all issues relating to Heritage's Objection to the CCP Claim; the Court set the Objection for trial in February 2021.[67]

The Court conducted a trial on the Objection on February 9 and 10, 2021. On March 3, 2021, counsel for the parties presented their closing arguments, and the Court took the matter under advisement.

## II.   ANALYSIS

The Court has carefully considered the CCP Claim, Heritage's Objection, the parties' prior arguments on the issues presented in the Objection, the Court's prior rulings, Heritage's Pretrial Statement,[68] CCP's Trial Memorandum,[69] and the evidence admitted at trial, and will separately address each component of the CCP Claim.

### A.   The Heritage Loan

The Court will evaluate the line items in the Heritage Loan component of the CCP Claim in the following order:  (1) CCP's entitlement to default interest, including the cap on the rate of default interest under the Third Party Lender Agreement and SBA regulations; (2) CCP's entitlement to the reimbursement of Valley's legal fees and CCP's legal fees; (3) the amount of the unpaid principal balance on the Heritage Loan as of the Petition Date; (4) CCP's claim for late charges; (5) CCP's claim for the

---

[67] Doc. Nos. 388 and 392.
[68] Doc. No. 471.
[69] Doc. No. 505.

accounting fees charged by Oscher Consulting, P.A.; and (6) CCP's claim for the fees charged by its appraiser. The Court previously ruled on some of the issues included in these line items, and summarizes its prior rulings in this Opinion to provide an integrated decision on Heritage's Objection to the CCP Claim.

### 1. Default Interest

As set forth above, the Court initially determined that the 2014 Note provided for default interest if Heritage defaulted in monthly payments, and later granted Heritage's motion for reconsideration of that ruling. To comprehensively resolve this issue, the Court will address, first, the enforceability of default interest provisions in bankruptcy cases; second, whether the course of dealing between Valley and Heritage estops CCP from asserting a claim for default interest; third, whether the Confirmation Order operated as a *de facto* reinstatement of the Heritage Loan; and fourth, whether the Third Party Lender Agreement capped the amount of default interest to which CCP is entitled.

### a. Contractual default interest provisions are enforceable in bankruptcy cases.

Under § 506(b) of the Bankruptcy Code,[70] oversecured creditors are entitled to postpetition interest up to the value of their collateral. In *United States v. Ron Pair*

---

[70] Unless otherwise stated, all statutory references are to the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

*Enterprises, Inc.*,[71] the Supreme Court held that oversecured creditors are entitled to postpetition interest; following *Ron Pair*, most courts have concluded that postpetition interest should be calculated at the contract rate.[72] There is no reasonableness requirement under § 506(b) for postpetition interest, even though the statute explicitly requires postpetition fees and costs to be reasonable.[73] As the Eleventh Circuit Court of Appeals explained in *In re Delta Resources, Inc.*, "a creditor's right to recover postpetition interest on its oversecured claim pursuant to 11 U.S.C. § 506(b) is virtually 'unqualified.'"[74]

In *In re John Q. Hammons Fall 2006, LLC*,[75] the bankruptcy court held that § 506(b) allows oversecured creditors to recover postpetition interest and any reasonable postpetition fees and costs that are provided for in the parties' agreement or under state statute. Consequently, the bankruptcy court held that an oversecured creditor's claim for postpetition *default* interest is allowable under § 506(b) as long as it is permitted under the contract and state law. And in *In re Family Pharmacy, Inc.*,[76] the court held that after the Supreme Court's ruling in *Ron Pair*, the interest rate under

---

[71] 489 U.S. 235, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989).
[72] *See, e.g., In re 1111 Myrtle Avenue Group, LLC*, 598 B.R. 729, 736 (Bankr. S.D.N.Y. 2019) ("The debtor bears the burden of rebutting the presumption that the contract rate of interest applies post-petition.").
[73] *In re Welzel*, 275 F.3d 1308, 1314 (11th Cir. 2001).
[74] 54 F.3d 722, 727 (11th Cir. 1995) (citations omitted).
[75] 612 B.R. 779, 794 (Bankr. D. Kan. 2020).
[76] 2020 WL 1291112, at *7 (8th Cir. BAP Mar. 19, 2020).

§ 506(b) for an oversecured creditor is the contract rate, both non-default and default, to the extent that the rate is enforceable under state law.

As the bankruptcy court held in *In re Sundale, Ltd.*,[77] Florida law expressly recognizes a lender's right to charge default interest if it is provided for in the underlying loan documents, and courts in Florida generally may not alter the lender's contractual right to default interest based on equitable considerations. For example, in *Hancock Bank v. Tote Enterprises, LLC*,[78] the defendant in a foreclosure action argued that default interest was essentially a penalty that could not be claimed by the plaintiff. But the court rejected that argument, holding that Florida courts are not at liberty to modify unambiguous terms in a note and mortgage, including provisions for a default rate of interest.

Accordingly, the Court determines that under § 506(b) and Florida law, the 2014 Note's default interest provision is enforceable.

**b.    Valley's course of dealing with Heritage does not estop CCP from asserting a claim for default interest.**

Heritage asserts that CCP is not entitled to default interest for two reasons: first, because Valley never declared a default or accelerated the note, as evidenced by

---

[77] 410 B.R. 101, 105 (Bankr. S.D. Fla. 2009).
[78] 2013 WL 12114832, at *4 (N.D. Fla. Apr. 2, 2013).

its assessment of late charges; and second, because the parties' course of dealing does not support a claim for default interest.[79]

On February 16, 2021, a week after the conclusion of the trial, CCP filed a *Motion to Strike "Course of Dealing" Evidence from the Record Presented at Claim Objection FEH* (the "Motion to Strike").[80] The Motion to Strike asserts two grounds for excluding the evidence: first, that Heritage failed to include the "course of dealing" issue in its Pretrial Statement;[81] and second, that the Court's detailed ruling at the May 20, 2020 hearing was incorporated in the Default Interest Order.[82]

At trial, in lieu of live testimony, the parties stipulated to the admission into evidence of the affidavit of Angela Morisco, Vice President with Valley's Special Assets Department.[83] Ms. Morisco stated that she is the person at Valley who was charged with collecting the Heritage Loan.[84]

Ms. Morisco attached to her affidavit a "full loan history" for the Heritage Loan (the "Valley Loan History").[85] Although somewhat difficult to interpret, the Valley Loan History reflects the date on which each payment from Heritage was received, the "due date" of the payment to which each payment was applied, Valley's

---

[79] Doc. No. 330, p. 3.
[80] Doc. No. 512.
[81] Doc. No. 471.
[82] Doc. No. 171.
[83] Doc. No. 519, February 9, 2021 Trial Transcript, pp. 40-41; Heritage's Ex. 111, Doc. No. 487-1, Affidavit of Angela Morisco.
[84] Heritage's Ex. 111, Doc. No. 487-1, Affidavit of Angela Morisco, ¶ 1.
[85] Heritage's Ex. 111.g, Doc. No. 487-9.

application of each payment to interest and principal, the resulting principal balance, and the accrual of late charges. Ms. Morisco's affidavit and the Valley Loan History indicate that Heritage made its last "regular" payment of $40,216.48 on September 30, 2019, which Valley applied to the payment due on August 14, 2019.[86]

In her affidavit, Ms. Morisco states that when Heritage failed to make the payment due for September 14, 2019, Valley deemed Heritage in default, accelerated the amount due and owing, and began accruing default interest as of September 15, 2019. Ms. Morisco acknowledges that Valley did not provide Heritage with written notice of default or otherwise inform Heritage that Valley was initiating its right to collect default interest;[87] her affidavit is consistent with Valley's Claim 27, which appears to include interest through February 3, 2020, at a greater rate than the contract rate—presumably the 24% default interest rate.[88] However, the Valley Loan History does not reflect the accrual of default interest, and when Valley applied the Retail Proceeds to the Heritage Loan, it applied them to contractual interest and not to default interest.[89]

---

[86] Heritage's Ex. 111, Doc. No. 487-1, Affidavit of Angela Morisco, ¶ 16; Heritage's Ex. 111.g, Doc. No. 487-9, p. 3.

[87] Heritage's Ex. 111, Doc. No. 487-1, Affidavit of Angela Morisco, ¶ 18.

[88] Although Claim 27 does not state a per diem amount, its "Accrued Interest as of February 3, 2020" of $571,684.32 (which would have accrued since September 15, 2019) is significantly higher than the amount of monthly interest reflected on the Valley Loan History ($26,000.00 to $27,000.00) during the months immediately preceding the default.

[89] In her affidavit, Ms. Morisco states that Valley did not apply the Retail Proceeds to default interest because they had not at that time been awarded by the Court (Heritage's Ex. 111, Doc. No. 487-1, Affidavit of Angela Morisco, ¶ 22).

At trial, one of Heritage's principals, Mr. Giovenco, testified that during the course of Heritage's relationship with Valley, Valley had agreed that if Heritage made a payment on the Heritage Loan each month, even if the payment was technically "late," Valley would not declare a default on the loan.[90] But, even if this were the case, Heritage made no payments to Valley after its September 30, 2019 payment was applied to the payment due on August 14, 2019.

Although Heritage argues it was unaware that Valley had asserted its right to default interest, as the Court found in its May 20, 2020 ruling, (1) Heritage expressly waived notice of default in the 2014 Note, (2) Heritage knew that Valley was claiming default interest as of December 2019, but failed to make payments to Valley even though it had the ability to do so at that time, and (3) most importantly, under the 2014 Note, Valley's delay in asserting the claim did not operate as a waiver of its right to default interest.[91]

After consideration of the evidence admitted at trial, the Court finds that Heritage did not meet its burden of proof to show that CCP is estopped from asserting a claim for default interest; because the Court has considered Heritage's evidence on this issue, the Court will deny the Motion to Strike as moot.

---

[90] Doc. No. 519, February 9, 2021 Trial Transcript, pp. 198-202.
[91] Doc. No. 192, May 20, 2020 Hearing Transcript.

### c. The Confirmation Order did not effect a reinstatement of the Heritage Loan.

Heritage contends that any default in its obligations under the 2014 Note was cured or "reversed" by operation of Section 9.2 of the Plan[92] and the Confirmation Order,[93] such that CCP may not recover default interest that accrued prior to entry of the Confirmation Order.

However, as the Court ruled in its May 26, 2020 Default Interest Order, the Confirmation Order specifically preserved Valley's claim for default interest:

> Notwithstanding the treatment of Valley in Article IV of the Plan, the Plan is modified to create a mechanism to resolve the issue of disputed default rate interest. Any disputed amounts will be held in escrow by [Heritage's] counsel pending further order of the Bankruptcy Court. [Heritage] shall pay Valley on account of the undisputed portions of Valley's secured claims, including any agreed interest and attorneys' fees, at the Closing of the Hotel Property.[94]

The Court further found that (1) the Plan contemplated payment to Valley in full at the closing of a sale of the Hotel, which was then anticipated to occur less than two months after entry of the Confirmation Order, (2) the Plan did not otherwise modify the Heritage Loan, and (3) the Plan did not contemplate that Heritage would continue to have a borrowing relationship with Valley. Consequently, the Court

---

[92] Doc. No. 66.
[93] Doc. No. 117.
[94] *Id.*, p. 2.

concluded that Section 9.2 of the Plan did not operate as a reinstatement of the Heritage Loan as of the date of the Confirmation Order.[95]

> **d.    The default rate of interest on the Heritage Loan is capped by agreement with the SBA.**

On October 27, 2020, the Court orally ruled that CCP may not claim default interest in excess of the maximum rate(s) published by the SBA.[96] The Court deferred entering a written order until it had ruled on the entirety of Heritage's Objection to the CCP Claim, and now supplements its oral ruling as follows.

> **i.    The SBA Loan Agreements**

In 2009, Heritage obtained additional financing for improvements to the Hotel from USAmeriBank and through a "504 Loan" in the amount of $874,000.00 (the "504 Loan"). 504 Loans are loans made by "Certified Development Companies" ("CDCs") working on the SBA's behalf with lenders "to provide small business financing;"[97] 504 Loans are guaranteed by the SBA.

---

[95] *Id.*, pp. 3-4.
[96] Doc. No. 408, October 27, 2020 Hearing Transcript, pp. 18-19.
[97] *Olson v. Market Square Hospitality, LLC*, 2019 WL 4059152, at *1 (N.D. Ill. Aug. 28, 2019).

The documents relating to Heritage's 504 Loan (the "SBA Loan Documents")[98] include an Authorization for Debenture Guarantee (the "SBA Authorization")[99] and the subsequent assignment of the 504 Loan from the CDC, the Florida Business Development Corporation, to the SBA.[100]

Generally, the SBA Loan Documents provided for USAmeriBank to lend Heritage $1,239,675.00 in connection with the 504 Loan; the SBA Authorization defines this amount as the "Third Party Lender Loan, " and states that "the Third Party Lender mortgage will include a pre-existing non-project debt in the amount of $6,405,800.00."[101]

Paragraph 3.c(7) of the SBA Authorization requires, at or before the closing of the 504 Loan, for the "Third Party Lender [USAmeriBank]" to execute a "Third Party Lender Agreement," that

> [c]onfirms that the Third Party Lender Loan has a reasonable interest rate *which does not and will not exceed the maximum interest rate for Third Party Loans* from commercial financial institutions as published periodically by SBA in the Federal Register and in effect as of the date of this Agreement.[102]

---

[98] Exhibits to the SBA's Claim 32 include (1) a Promissory Note and Second Mortgage in the amount of $867,772.00 from Heritage to USAmeriBank, (2) an assignment of the Note and Mortgage from USAmeriBank to the CDC, (3) a Renewal Note dated January 14, 2010, whereby Heritage promises to pay $874,000.00 to the CDC, (4) an Assignment of Mortgage and Conditional Assignment of Lease by Lessor, whereby the CDC assigns its mortgage to the SBA, and (5) a Third Party Lender Agreement dated January 19, 2010, between USAmeriBank and the CDC.

[99] Doc. No. 341, pp. 12-27.

[100] SBA Claim 32, Part 2, pp. 24-33.

[101] Doc. No. 341, p. 14.

[102] *Id.*, pp. 14-15 (emphasis added).

On January 14, 2010, in connection with the Third Party Lender Loan, Heritage executed and delivered to USAmeriBank a "Consolidation and Renewal Promissory Note" in the amount of $7,645,475.00, equal to the $6,405,800.00 pre-existing "non-project" debt—the balance due on the Heritage Loan—and the $1,239,675.00 additional financing provided by USAmeriBank (the "Consolidation Note").[103] On January 19, 2010, USAmeriBank executed the Third Party Lender Agreement.[104]

Although the SBA Authorization defined the "Third Party Lender Loan" as the $1,239,675.00 in additional financing from USAmeriBank, the Third Party Lender Agreement states that "the Third Party Lender [USAmeriBank] will provide term financing (Third Party Loan)," and states the "Third Party Loan Amount" as "$7,645,475.00 (of which $6,405,800.00 is pre-existing, non-project debt)."[105]

The Third Party Lender Agreement also includes the following relevant provisions:

a.      Subparagraph 5(f) limits the amount of interest that may be charged on the Third Party Loan. It states:

> The Third Party Loan has a *reasonable interest rate which does not and will not exceed the maximum interest rate* for Third Party Loans from commercial financial institutions as published periodically by SBA in the <u>Federal Register</u> and in effect as of the date of this Agreement.[106]

---

[103] CCP's Ex. 8, Doc. No. 468-8.
[104] SBA Claim 32, Part 2, pp. 35-42.
[105] *Id.*, p. 35, ¶ 1.
[106] *Id.*, p. 36, ¶ 5(f) (emphasis added).

b.      Paragraph 8 limits the amount of *default* interest that the Third Party Lender (USAmeriBank) may charge to the maximum rate allowed by the SBA. It states:

> *Third Party Lender [USAmeriBank] may not escalate the rate of interest upon default to a rate greater than the maximum rate published by SBA* in the <u>Federal Register</u> from commercial financial institutions in effect as of the date of this Agreement. *SBA will only pay the interest rate on the note in effect before the date of Borrower's default.*[107]

In other words, the Third Party Lender Agreement required USAmeriBank to agree that it would not escalate the rate of interest upon default to a rate greater than the maximum rate published by the SBA *and* that the SBA was only obligated to pay interest at the contract rate.

c.      Paragraph 13 provides that in the event of a conflict with any other agreement that the Third Party Lender [USAmeriBank] has with a third party, *including the Borrower*, the Third Party Lender Agreement controls.[108]

d.      And finally, Paragraph 14 states that it inures to the benefit of the parties' successors and assigns, "including any party acquiring the Third Party Loan and Third Party Lender Lien by sale, assignment, or other transfer from Third Party Lender."[109]

---

[107] *Id.*, p. 37, ¶ 8 (emphasis added).
[108] *Id.*, p. 38, ¶ 13 (emphasis added).
[109] *Id.*, p. 38, ¶ 14.

## ii.    The SBA Regulations

The regulations applicable to SBA-guaranteed loans include three relevant provisions:  13 C.F.R. §§ 101.100, 120.921, and 120.922.

First, 13 C.F.R. § 101.100 is a general provision titled "What is the purpose of SBA?" It states in part: "The U.S. Small Business Administration (SBA) aids, counsels, assists, and protects the interests of small business concerns, and advocates on their behalf within the Government. . . . It provides financial assistance, contractual assistance, and business development assistance."[110]

Second, the following provisions of 13 C.F.R. § 120.921, titled "Terms of Third Party loans," provide for the SBA to establish a maximum interest rate for any Third Party loan; that the Third Party Lender's lien for prepayment penalties, late fees, and default interest will be subordinate to the SBA's lien; and that a Third Party Lender may not escalate the rate of interest upon default to a rate higher than the maximum rate established by the SBA:

> (b) Interest rates. Interest rates must be reasonable. *SBA must establish and publish in the Federal Register a maximum interest rate for any Third Party Loan from commercial financial institutions.* The rate shall remain in effect until changed.
>
> . . .
>
> (e) Subordination. The Third Party Lender's lien will be subordinate to the CDC/SBA lien regarding any prepayment penalties, late fees, other

---

[110] 13 C.F.R. § 101.100.

default charges, and escalated interest after default due under the Third Party Loan.

(f) *Escalation upon default. A Third-Party Lender may not escalate the rate of interest upon default to a rate greater than the maximum rate set forth in paragraph (b) of this section.* Regarding any Project that SBA approved after September 30, 1996, *SBA will only pay the interest rate on the note in effect before the date of the Borrower's default.*[111]

In 1996, the SBA published a notice in the Federal Banking Law Reporter regarding Title 13 of the Code of Federal Regulations, effective March 1, 1996. Regarding 13 C.F.R. § 120.921, the SBA's notice clarifies the limitation on a Third Party Lender's ability to charge default interest, stating:

As a result of comments received, two subsections have been added to § 120.921. . . . The language of the proposed rule has been changed to clarify that a Third-Party lienholder must subordinate to the CDC/SBA lien any future advance in excess of the outstanding principal balance and accrued interest of the Third-Party Loan at the time of such advance. *The new § 120.921(e) prohibits a Third-Party lender from escalating the rate of interest upon default to an amount greater than the maximum rate in § 120.921(b).*[112]

And third, 13 C.F.R. § 120.922 provides that the Third Party Loan may include the consolidation of existing debt. It states that "[i]n addition to its share of Project cost, a Third-Party Loan *may include consolidation of existing debt* on the Project Property. . . ."[113]

---

[111] 13 C.F.R. § 120.921 (emphasis added).
[112] 1996 WL 35026443 (emphasis added).
[113] 13 C.F.R. § 120.922.

### iii.    Analysis

First, the Court finds that the Third Party Lender Agreement (a) controls over and supersedes any conflicting provision in any other agreement, including the dollar amount defined as the "Third Party Lender Loan" in the SBA Authorization; (b) defines the "Third Party Loan Amount" as $7,645,475.00 with the parenthetical explanation "of which $6,405,800.00 is pre-existing, non-project debt;" and (c) is binding upon USAmeriBank's successors and assigns, including CCP.

Second, under 13 C.F.R. § 120.922, a "third-party loan" may include the consolidation of existing debt on the project property. This is what occurred here when USAmeriBank consolidated its existing debt in the Consolidation Note. The Court concludes that the Third Party Loan is the $7,645,475.00 as defined in the Third Party Lender Agreement. The Court further finds this analysis protects the SBA's junior lien from being adversely affected by the accrual of excessive default interest on a senior mortgage and is consistent with the SBA's stated purpose to "protect the interests of small business concerns."

Third, contrary to CCP's argument that Heritage has no private right of action to enforce the SBA regulations,[114] the Court finds that Heritage is not precluded from

---

[114] Doc. No. 341, p. 6.

relying on the SBA Loan Documents and SBA regulations to support its position; the two cases cited by CCP do not apply to Heritage's objection to the CCP Claim.[115]

It is well-settled that "[n]o private right of action under a statute is necessary to assert a violation of that statute as an affirmative defense."[116] For example, in *Costello v. Grundon*, former employees signed promissory notes based on their participation in their employer's shared investment plan. When the employer filed a bankruptcy case, a trustee of the employer's "litigation trust" sued the employees to enforce the notes, and the employees asserted the defense that the notes were unenforceable because they violated regulations issued by the Federal Reserve System.[117] The trustee argued that the employees could not assert the defense because they did not have a private right of action under the law.

The Seventh Circuit rejected the trustee's position, relying in large part on the Supreme Court's decision in *Kaiser Steel Corporation. v. Mullins.*[118] In *Kaiser Steel*, the Supreme Court determined that a defendant who was sued on a contract could raise

---

[115] In *Profiles, Inc. v. Bank of America Corp.*, 453 F. Supp. 3d 742 (D. Md. 2020), a putative class plaintiff alleged that a bank had imposed restrictions on borrowing under the Payroll Protection Program that were inconsistent with provisions of the CARES Act, which amended the Small Business Act. And in *Bulluck v. Newtek Small Business Finance, Inc.*, 808 F. App'x 698 (11th Cir. 2020), the plaintiff filed a complaint for negligence and breach of contract alleging that the defendant, a mortgage loan servicer, breached a duty of care under SBA loan servicing guidelines. In each case, the plaintiff affirmatively stated a claim for breach of SBA regulations or guidelines.

[116] *Costello v. Grundon*, 651 F.3d 614, 624 (7th Cir. 2011) (citing *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 86, 102 S. Ct. 851, 70 L. Ed. 2d 833 (1982)).

[117] *Id.* at 620-621.

[118] 455 U.S. 72, 102 S. Ct. 851, 70 L. Ed. 2d 833 (1982).

a defense that the contract was void and unenforceable as a violation of federal law.

In reaching this decision, the Supreme Court noted the difference between suing to

enforce an illegal obligation and raising the illegality of the obligation as a defense:

> A defendant proffering the defense seeks only to be relieved of an illegal obligation and does not ask any affirmative remedy based on the . . . laws. [A]ny one sued upon a contract may set up as a defence that it is a violation of the act of Congress, and if found to be so, that fact will constitute a good defence to the action."[119]

In addition, the Supreme Court noted that courts will not assist in the

enforcement of an illegal contract as a matter of public policy,[120] and held that where

enforcement of a private agreement would violate a public policy as manifested in a

federal statute, federal courts have the obligation "to refrain from such exertions of

judicial power."[121]

Following the *Kaiser Steel* analysis, the Seventh Circuit in *Costello* found that a

private right of action is not a prerequisite to asserting regulatory violations as a

defense to an action to enforce a contract.[122] Since then, numerous courts have held

---

[119] *Kaiser Steel Corp. v. Mullins*, 455 U.S. at 81, n. 7 (quoting *E. Bement & Sons v. National Harrow Co.*, 186 U.S. 70, 88, 22 S. Ct. 747, 754, 46 L. Ed. 1058 (1902)).
[120] *Id.* at 77-78.
[121] *Id.* at 83-84 (quoting *Hurd v. Hodge*, 334 U.S. 24, 34-35, 68 S. Ct. 847, 853, 92 L. Ed. 1187 (1948)).
[122] *Costello v. Grundon*, 651 F.3d at 624-29.

that defendants are not precluded from asserting defenses based on a statute even when the statute does not provide a private right of action.[123]

Here, Heritage has not asserted a claim against CCP arising from the Third Party Lender Agreement or the SBA's regulations. Rather, Heritage asserts the SBA regulations as a defense to the CCP Claim. Under the *Kaiser Steel* and *Costello* cases, Heritage is not precluded from raising this defense.

Finally, CCP also argues that the Third Party Lender Agreement terminated upon payment of the SBA Mortgage.[124] But the SBA Mortgage was not paid until the closing of the Ally Sale.

Accordingly, the Court concludes that CCP's claim to default interest on the Heritage Loan is capped at the maximum rates published by the SBA.

## 2. Attorney's Fees

Under § 506(b), an oversecured creditor may seek reimbursement of "reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."[125] A creditor seeking reimbursement from the estate under § 506(b) must demonstrate (a) that its claim is oversecured, (b) that the

---

[123] *ABC & S, Inc. v. MacFarlane Group, Inc.*, 2015 WL 300483, at *3 (N.D. Ill. Jan. 22, 2015) (The defendant's illegality defense did not fail because there was no private right of action under the securities regulations.); *Duke Energy Progress, Inc. v. Frontier Communications of the Carolinas, Inc.*, 2014 WL 4948112, at **5 (E.D.N.C. Sept. 25, 2014) ("[C]ase law does not support uniformly barring assertion of a defense based upon a statute where the statute does not provide a private right of action.").

[124] Doc. No. 341, ¶ 17.

[125] 11 U.S.C. § 506(b).

agreement between the secured creditor and the debtor provides for attorney's fees

and costs, and (c) that the fees and costs requested are reasonable.[126]

As the court in *In re Digital Products Corporation* stated, a secured creditor

seeking fees under § 506(b) "is allowed only reasonable attorneys fees and expenses

in enforcing its rights."[127] Reasonable fees and costs are defined as

> those necessary to the collection and protection of a creditor's claim and
> include fees for those actions which a similarly situated creditor might
> have taken. The fees must be cost justified by the economics of the
> situation and necessary to preserve the creditor's interest in light of the
> legal issues involved. A secured creditor is not entitled to compensation
> for its attorneys fees for every action it takes by claiming that its rights
> have been effected [sic].[128]

In determining the reasonableness of a request for fees under § 506(b),

bankruptcy courts must require that fee applications "contain a certain level of

content and specificity."[129] Consequently, fees for services that are "lumped" or

"bundled" in a single entry will be disallowed because they inhibit the court's ability

to determine whether the services were necessary and valuable.[130] In such cases, "a

---

[126] *In re Reorganized Lake Diamond Associates, LLC*, 367 B.R. 858, 874 (Bankr. M.D. Fla. 2007) (citations omitted).

[127] *In re Digital Products Corp.*, 215 B.R. 478, 482 (Bankr. S.D. Fla. 1997).

[128] *Id.* (citation omitted).

[129] *In re McGuier*, 346 B.R. 151, 164-65 (Bankr. W.D. Pa. 2006).

[130] *Id.* CCP's attorneys have frequently cited to this Court's ruling in *In re Basil Street Partners, LLC*, 2014 WL 3563227 (Bankr. M.D. Fla. July 18, 2014), for the proposition that block billing is permissible by a secured creditor. But in *Basil Street*, the Court did not address an oversecured creditor's claim for fees under § 506(b). Rather, the issue involved several non-debtor parties' claims for prevailing party attorney's fees against another non-debtor in litigation that had been removed from state court to the bankruptcy court and tried in the bankruptcy court with the consent of the parties.

court must rely on its own knowledge and experience in arriving at a proper fee award."[131]

### a.    Valley's Legal Fees

In the Default Interest Application, Valley asserted that as of February 3, 2020, it had incurred attorney's fees in the amount of $23,678.51.[132] When Heritage responded to the Default Interest Application, it did not object to Valley's entitlement to attorney's fees under the Heritage Loan Documents or to the amount of the fees requested.[133]

The CCP Claim includes a line item for Valley's legal fees through June 5, 2020, in the amount of $123,604.00.[134] The claim is supported by the Affidavit of Patrick Mosley, Esq., the attorney at the law firm of Hill Ward Henderson ("HWH") with primary responsibility for representing Valley in this case.[135] In his affidavit, Mr. Mosley attests, first, that HWH's representation of Valley ended when Valley assigned its claims to CCP on June 5, 2020; second, that he had subtracted the fees related to the Claim Assignment from the total fees charged by HWH; and third, that

---

[131] *In re Digital Products Corp.*, 215 B.R. at 482 (citation omitted) (The Court reduced the creditor's fees where the case had been "over-litigated" and the creditor's actions "were more in line with an attempt to acquire the Debtor than protect its over-secured claim.").

[132] Doc. No. 119, p. 4; Claim 27, Part 2, p. 1.

[133] Doc. No. 142.

[134] Claim 35, Part 2, p. 3.

[135] Claim 35, Part 5, pp. 43-46.

HWH had incurred legal fees of $123,604.00 and costs of $23.58, for a total of $123,627.58, to represent Valley in Heritage's bankruptcy case through June 5, 2020.

Heritage objects to the total amount of legal fees claimed for HWH's representation of Valley.[136] First, Heritage notes that HWH incurred almost $100,000.00 in fees during the four-month period from February 3 to June 5, 2020. Second, Heritage asserts that the time spent by Valley's attorneys was excessive and that HWH's billing statements do not adequately describe the services performed and time allocated in performing those services.[137]

HWH's invoices are in evidence.[138] During the seven and one-half month period that HWH provided services to Valley in connection with Heritage's bankruptcy case, HWH billed for 385.3 hours of services, most of which were performed by Mr. Mosley at the billing rate of $360.00 per hour. The services primarily related to Valley's claim for default interest, the sales of the Retail Parcel and the Hotel, Heritage's Plan and the Plan Modification Motion, Valley's five proofs of claim, Heritage's objections to the claims, and Valley's discovery requests to and from Heritage.

Scott Shuker, Esq., testified at trial on CCP's behalf as an expert witness on the reasonableness of legal fees. Mr. Shuker opined that HWH's hourly rates were

---

[136] Doc. No. 330, p. 5; Doc. No. 471, pp. 4-5.
[137] Doc. No. 471, pp. 4-5.
[138] CCP's Ex. 56, Doc. No. 469-26.

reasonable (or low) and that the legal fees incurred by Valley were reasonable in the full amount claimed of $123,604.00.[139]

Heritage did not offer expert testimony on the issue of Valley's claimed attorney's fees. Instead, Heritage submitted an annotated version of HWH's invoices, together with a summary of the invoices, as demonstrative exhibits.[140] This summary includes a breakdown of (1) what Heritage characterizes as "compensable time" for general services provided by HWH in connection with the Plan and confirmation issues, Valley's opposition to the Plan Modification Motion, Valley's Default Interest Application, and Heritage's Reconsideration Motion; and (2) what Heritage characterizes as "non-compensable time" because the time entries consist of "block billing" (lumping more than one task in a single billing entry), duplicative entries, redacted/insufficient descriptions of the services, and unnecessary, unreasonable, or unrelated services.

Heritage's summary reflects fees for "compensable time" in the amount of $86,581.00 and total fees in the amount of $119,110.50. Based on its review of the invoices, Heritage contends that Valley's legal fees should be allowed in the reduced amount of $65,000.00.[141]

---

[139] Doc. No. 520, February 10, 2021 Trial Transcript, pp. 159-60.
[140] Heritage's Exs. 106 and 107, Doc. Nos. 473-8 and 473-9.
[141] Heritage's March 3, 2021 closing argument.

In determining the reasonableness of Valley's attorney's fees, the Court notes, first, that Heritage did not object to Valley's request for fees of $23,678.51 as of February 3, 2020, as included in the Default Interest Application.[142]

Second, having reviewed Heritage's annotation of the HWH invoices, the Court does not concur with Heritage's analysis of "non-compensable time." There are relatively few instances of block billing, and the redactions generally relate to emails and telephone calls between HWH attorneys and their client, Valley, which were likely redacted as attorney-client privileged communications.

And third, it appears that Valley was satisfied to take a "wait and see" approach in the early months of the case, with HWH's invoices for October through December 2019 never exceeding $6,000.00. But as Heritage's sale to a third party fell through in January 2020, and its sale to Liberty fell through in April 2020, Valley's legal fees increased. At that point, Valley possessed valid concerns regarding Heritage's proposed Plan Modification—that would have extended the Heritage Loan's maturity date until December 2021 and not required Heritage to make interest payments until the Hotel generated a positive cash flow—and the increasingly complicated default interest issues raised by Heritage in the Reconsideration Motion.

The Court finds that Valley's attorney's fees were reasonably incurred and will allow them as set forth in the CCP Claim in the amount of $123,604.00.

---

[142] Doc. No. 119.

### b.    CCP's Legal Fees

The CCP Claim includes $121,625.50 for CCP's legal fees incurred between June 1 and September 1, 2020.[143] During this period, CCP was represented by Anthony & Partners, LLC ("A&P"). A&P's invoices are in evidence.[144] In addition, CCP submitted a summary of A&P's invoices, broken down by attorney, as a demonstrative exhibit.[145] The summary reflects that A&P provided a total of 384.6 hours in services to CCP from June 1 to September 1, 2020, at a blended rate of $350 per hour. The total fees reflected in the summary amount to $134,707.50.

Heritage objects to the amount of CCP's legal fees as unreasonable.[146] As a threshold objection, Heritage contends that CCP purchased the Heritage Loan so that it could acquire the Hotel, and that the bulk of CCP's attorney's fees were not incurred for the purpose of collecting, protecting, or enforcing the Heritage Loan, but were instead incurred to facilitate CCP's efforts to acquire the Hotel. Although Heritage acknowledges that a party's acquisition of a claim for the purpose of acquiring the underlying collateral is not inherently illegitimate, Heritage contends that the bankruptcy estate should not be required to pay the attorney's fees incurred for that purpose under § 506(b).

---

[143] Claim 35, Part 2, p. 3, and Part 5, pp. 48-49.
[144] CCP's Ex. 55, Doc. No. 469-25.
[145] CCP's Ex. 57, Doc. No. 469-27.
[146] Doc. No. 330, p. 5; Doc. No. 471, p. 5.

The evidence at trial was that CCP paid Valley $5.5 million for the Valley Claims acquired in the Claim Assignment,[147] and that CCP financed the purchase, in part, by borrowing $4.2 million from RSKS Investments, LLC ("RSKS").[148] Interest on the $4.2 million loan from RSKS accrues at 8% per annum.[149]

Santosh Govindaraju, CCP's managing member, testified that he knew that Heritage had filed the Reconsideration Motion and was "fighting" the Court's ruling on default interest, but that CCP planned to earn a profit on the difference between the 8% interest it was obligated to pay RSKS on the $4.2 million loan and the 24% default interest it hoped to be paid on the Heritage Loan.[150]

Mr. Govindaraju also testified that he was "a patient investor" and that after acquiring the Heritage Loan in June 2020, "we were patiently waiting to see what [Heritage's] proposed Plan would be. It could have been an infusion of equity capital . . . . We could have done a workout with them. There are plenty of options out there during difficult times, but we were waiting to see what [Heritage] had planned."[151]

Although the Court generally finds Mr. Govindaraju to be a credible witness, his description of himself as a "patient investor" is belied by the record in this case. For example, CCP acquired the Heritage Loan on June 5, 2020. Two days later, on

---

[147] Heritage's Ex. 111.i, Doc. No. 487-10, p. 3, ¶ 1(b).
[148] Heritage's Ex. 112, Doc. No. 487-23, p. 6. In addition, $510,714.29 was funded by Thompson Concap LLC, $510,714.29 was funded by Alnika Capital LLC, and $185,714.29 was funded by Skandar LLC.
[149] Doc. No. 519, February 9, 2021 Trial Transcript, pp. 61-63; Heritage's Ex. 112, Doc. No. 487-23.
[150] Doc. No. 519, February 9, 2021 Trial Transcript, pp. 72, 76.
[151] *Id.*, pp. 56-57.

June 7, 2020, one A&P attorney "capped" his time entry at eight hours, which included "work on motion for stay relief or to confirm that stay has terminated," billing $4,040.00 in attorney's fees in a single day; the next day, June 8, 2020, that attorney billed another $4,040.00 in fees by working on the file from 9:15 a.m. to 9:30 p.m.; and on June 9, 2020, the same attorney billed an additional seven hours on the file, incurring $3,565.00 in fees.[152]

On June 8, 2020—just three days after CCP acquired the Heritage Loan—a second A&P attorney spent 6.4 hours drafting a motion for relief from the automatic stay and a response to the Reconsideration Motion, incurring $1,600.00 in attorney's fees.[153] And on June 9, 2020, a third A&P attorney spent 4.3 hours, incurring $1,096.50 in attorney's fees, to review and analyze the Heritage Loan Documents and to begin "drafting [a state court] complaint against guarantors."[154] In fact, between June 8 and June 15, 2020—during the first week after CCP acquired the Heritage Loan—four A&P attorneys and one paralegal incurred $26,668.00 in attorney's fees. The time expended and the services rendered do not support Mr. Govindaraju's description of himself as a "patient investor."

---

[152] CCP's Ex. 55, Doc. No. 469-25, pp. 6-7.
[153] *Id.*, p. 6.
[154] *Id.*, p. 7.

Mr. Govindaraju acknowledges that on July 28, 2020, he learned of Heritage's proposed sale of the Hotel to Ally.[155] CCP's lead attorney, Mr. Anthony, knew Ally's principal, Andrew Wright, and appeared to hold him in high regard,[156] and Ally was represented in the Heritage bankruptcy case by a long-established law firm that specializes in Chapter 11 bankruptcy cases.[157] And Mr. Govindaraju understood that the sale price was $8 million, an amount more than sufficient to pay the Heritage Loan—including the claimed default interest—in full.[158] If Mr. Govindaraju's goal was to collect the difference between the 8% interest that CCP owed to RSKS on the $4.2 million dollar loan and the 24% default interest that CCP claimed under the Heritage Loan, CCP would have acted as a "similarly situated creditor"[159] and supported the sale of the Hotel to Ally. But this did not occur.

Instead, CCP aggressively opposed the Ally Sale by filing the following papers: an objection to Heritage's Bid Procedures Motion, alleging concerns regarding the chilling effect on other purchasers of a proposed break-up fee if Ally was not the successful bidder, and concerns regarding CCP's credit bid rights (which would only have affected CCP if it wished to bid on the Hotel);[160] two supplements to the

---

[155] Doc. No. 519, February 9, 2021 Trial Transcript, p. 58.
[156] *Id.*, p. 33, ll. 24-25.
[157] Ally was represented by Stichter, Riedel, Blain & Postler, P.A.
[158] Doc. No. 519, February 9, 2021 Trial Transcript, p. 58.
[159] *In re Digital Products Corp.*, 215 B.R. at 482.
[160] Doc. No 252.

objection;[161] an objection to Heritage's sale motion;[162] a motion to reconsider Heritage's employment of a broker, objecting to the amount of his commission (an issue that did not affect CCP);[163] an appeal from the Court's order authorizing the Ally Sale;[164] a motion for a stay pending appeal in the Bankruptcy Court;[165] an appeal of the Court's interlocutory ruling on the Reconsideration Motion and a motion in District Court for leave to appeal;[166] and, after the Ally Sale had closed, an objection to the broker's application for fees.[167]

In addition, at the five hearings in this case between June 10 and September 1, 2020, CCP was represented by two or three—and on one occasion four—A&P attorneys.[168]

Lynn Sherman, Esq., testified at trial as Heritage's expert on the reasonableness of CCP's attorney's fees. Ms. Sherman testified that an oversecured creditor—such as CCP in this case—does not typically object to bid procedures or to a sale of collateral if the price is sufficient to pay its claim in full.[169]

---

[161] Doc. Nos. 255 and 261.

[162] Doc. No. 287.

[163] Doc. No. 259.

[164] Doc. No. 308.

[165] Doc. No. 317.

[166] Doc. No. 320. On January 23, 2021, the District Court denied CCP's motion for leave to appeal and dismissed the appeal (Doc. No. 454).

[167] Doc. No. 372.

[168] June 10, 2020 – two attorneys (Doc. No. 213); July 30, 2020 – two attorneys (Doc. No. 267); August 3, 2020 – two attorneys (Doc. No. 275, CCP's Ex. 115, Doc. No. 507-1, p. 25); August 25, 2020 – three attorneys (Doc. No. 303); September 1, 2020 – four attorneys (Doc. No. 321).

[169] Doc. No. 519, February 9, 2021 Trial Transcript, pp. 128-29.

To form her opinion of the reasonableness of CCH's legal fees, Ms. Sherman started with the amount of the A&P fees included in the CCP Claim ($121,625.50) and subtracted $40,960.50 for the time spent by A&P attorneys in objecting to the bid procedures and the sale to Ally, arriving at a subtotal of $80,664.50. From the $80,664.50, Ms. Sherman subtracted 20% because of block billing in the invoices, reducing the fees to $64,531.60, which she then reduced by $15,000.00 because A&P's attorneys had duplicated work previously performed by HWH, particularly in connection with research on the default interest issue. Ms. Sherman concluded that CCP's reasonable attorney's fees of $49,531.60 are compensable under § 506(b).[170]

Mr. Shuker, CCP's expert witness on the reasonableness of attorney's fees, opined that, under the facts of this case, it was not unreasonable for CCP to object to Heritage's bid procedures or to appeal the Court's sale order. In addition, Mr. Shuker testified that Ms. Sherman's across-the-board 20% deduction for block billing was overly broad.[171] However. Mr. Shuker also testified that because of block billing and some duplication of services, CCP's fees should be reduced by $19,201.00, and concluded that CCP's legal fees should be allowed in the reduced amount of $102,424.50.[172]

---

[170] *Id.*, pp. 151-53.
[171] Doc. No. 520, February 10, 2021 Trial Transcript, pp. 170-74.
[172] *Id.*, pp. 161-62.

As an initial matter, the Court makes no determination regarding CCP's motives for purchasing the Heritage Loan. Although one could easily infer that CCP acquired the Heritage Loan with an eye to acquiring the Hotel from (1) the circumstances surrounding CCP's purchase of the Heritage Loan,[173] (2) CCP's offer in August 2020 to pay $7.9 million for the Hotel,[174] and (3) the legal services performed by A&P on CCP's behalf, the Court need not decide that issue. Rather, under § 506(b), the issue before the Court is whether CCP's fees and costs were reasonable and related to its legitimate efforts to collect, protect, and enforce the Heritage Loan. On the record before it, the Court concludes that they were not.

---

[173] Portions of the deposition testimony of Punit Shah were read into evidence at trial. Mr. Shah testified that he was a close personal friend of Mr. Govindaraju; that on March 13, 2020, he (Mr. Shah) through his entity, Liberty DTSP, LLC, signed a purchase agreement to purchase the Hotel from Heritage for $10,150,000.00; that he and his family were clients of the law firm representing Heritage in bankruptcy; and that the bankruptcy attorney referred him to another law firm in connection with the purchase of the Hotel because of the conflict of interest. Mr. Shah testified that he learned during the due diligence period that he was unable to re-brand the Hotel and that he would need to pay for deferred maintenance, and that he terminated the purchase agreement on April 9, 2020 (Doc. No. 519, February 9, 2021 Trial Transcript, pp. 82-90; Heritage's Exs. 75 and 80, Doc. Nos. 472-7 and 472-13). By coincidence, Mr. Govindaraju—who testified that Mr. Shah is a "good" friend but not a "best" friend—learned from a banker contact that Valley wished to divest itself of the Heritage Loan (Doc. No. 519, February 9, 2021 Trial Transcript, pp. 62-63; Doc. No. 520, February 10, 2021 Trial Transcript, p. 102). Also by coincidence, Mr. Govindaraju financed the purchase of the Heritage Loan with a $4.2 million loan from another client of A&P, RSKS, an entity, that coincidentally is owned by Mr. Shah's parents and for which Mr. Shah is the "client representative" (Doc. No. 519, February 9, 2021 Trial Transcript, pp. 91-92). Mr. Shah testified that he didn't tell his parents that he had previously been interested in acquiring the Hotel, that the Hotel was in poor condition, or that it could not be re-branded (Doc. No. 519, February 9, 2021 Trial Transcript, pp. 93, 99).

[174] Doc. No. 261, pp. 2-3. Heritage did not accept CCP's offer because it required Heritage to agree to CCP's payoff figure and because Heritage anticipated active bidding for the Hotel (Doc. No. 281, August 3, 2020 Hearing Transcript, p. 7, ll. 17-20 and pp. 15-16).

First, CCP's lead attorney, Mr. Anthony, is well known in the local bankruptcy community as an extremely talented attorney who is well versed in commercial and bankruptcy law. Yet A&P over staffed this case with three or more attorneys—including sending at least two attorneys to every hearing—to implement what this Court can only characterize as a full-court press designed to exert maximum pressure on Heritage and the Guarantors.[175]

Second, CCP knew that the purchase price for the proposed sale of the Hotel in January 2020 was $10,550,000.00 and that Valley's Claim 27 stated that the Hotel was valued at $10.5 million. Less than two months after the Claim Assignment, Heritage filed the Bid Procedures Motion seeking approval to sell the Hotel for $8 million, which was more than sufficient to pay CCP's claim in full even if this Court were to determine that CCP is entitled to default interest at 24%.

Third, the attorney's fees incurred by CCP—in only three months—are nearly equal to the fees incurred by Valley over a ten-month time period and, in part, duplicated services provided by HWH on the default interest issue.[176] Fees for duplicate work are not reasonable under § 506(b).[177]

---

[175] CCP's Ex. 57, Doc. No. 469-27. The timekeeper summary reflects that five attorneys worked on the file, with three attorneys performing the majority of the services on CCP's behalf.

[176] The fees requested in Claim 35 are, no doubt, just the tip of the iceberg as the fees are for services performed in three months ending on September 2, 2020, and CCP also may seek to recover attorney's fees for A&P's services performed after September 1, 2020.

[177] *See, e.g., In re Navient Solutions, LLC*, 627 B.R. 581, at 592-593 (Bankr. S.D.N.Y. 2021).

Fourth, A&P's pervasive practice of block billing precludes the Court from determining whether the fees were reasonably incurred. For example, the Court cannot determine the amount of fees charged by A&P for drafting CCP'S motion for relief from stay.[178] The seven-page motion contains the same basic information found in every motion for relief from stay under § 362(d) in a Chapter 11 case. However, A&P's time entries show that the attorneys "began work" on the motion on June 7, 2020, and continued to draft and revise the motion until it was filed on July 27, 2020. In the entries, the time spent by at least three attorneys and a law clerk on the motion for relief from stay is lumped together with services that they performed on other issues on June 7, June 8, June 12, June 14, June 22, July 20, July 24, and July 26, 2020. The charges for the bundled services range from $353.50 to $4,040.00 per day.[179] It is impossible to determine from the attorneys' time entries how much of the total daily charges are allocated to the stay relief motion.[180] For the same reasons, the Court

---

[178] Doc. No. 243.

[179] CCP's Ex. 55, Doc. No. 469-25, pp. 6-19.

[180] The Court notes that the standard attorney's fee allowed in the Tampa Division for a motion for relief from stay in a routine consumer case is $450.00.

cannot determine the total charges for A&P's work on the state court complaint against the Guarantors.[181]

Fifth, CCP's actions in opposing Heritage's efforts to sell the Hotel to Ally were obstructive and required Heritage to incur unnecessary fees.[182] For example, CCP filed its initial objection to Heritage's Bid Procedures Motion on July 29, 2020,[183] followed by a supplement on July 30, 2020,[184] and a "second" supplement on August 2, 2020.[185] CCP also filed an objection to Heritage's motion to sell the Hotel to Ally, and later filed an appeal of the orders approving the bid procedures and the sale to Ally, together with a motion for stay pending the appeal.[186] Heritage's attorneys were obligated to assess and respond to CCP's objections and appeals,[187] with the result that Heritage has incurred additional attorney's fees as an administrative expense in its Chapter 11 case.

---

[181] CCP's Ex. 55, Doc. No. 469-25, pp. 7-20 (Bundled time entries for June 9, June 10, June 11, June 12, June 29, June 30, July 1, July 3, July 7, July 12, July 13, July 15, July 20, July 21, and July 27, 2020). CCP's motion for relief from stay (filed on July 27, 2020 in the midst of the world-wide COVID-19 pandemic and the near shutdown of the Florida hospitality industry) refers to the state court action, stating that "[t]he Guaranty Action . . . was commenced against [the Guarantors] *when it became apparent that [Heritage's] delay in this Reorganization was prejudicing its rights* (Doc. No. 243, ¶ 2) (emphasis added).

[182] The Court notes that Heritage's attorney's fee applications are currently pending (Doc. Nos. 538 and 540). CCP has objected to Heritage's attorney's fee applications (Doc. Nos. 539 and 541). The Court intends to rule upon Heritage's attorney's fee applications in connection with the anticipated request for additional fees by CCP.

[183] Doc. No. 252.

[184] Doc. No. 255.

[185] Doc. No. 261.

[186] Doc. Nos. 287, 308, and 317.

[187] *See, e.g.*, Doc. Nos. 262 and 327.

The record in this case is that Heritage's sale of the Hotel to Ally for $8 million was based on the highest and best offer for the purchase of Heritage's assets after an extensive marketing process.[188] CCP's opposition to the Ally Sale produced no benefit to the estate; to the contrary, CCP's opposition only made the sale process more time-consuming and expensive for all interested parties, a result that was foreseeable to CCP at the time that Heritage first filed the Bid Procedures Motion.

In *In re Reorganized Lake Diamond Associates, LLC*,[189] the bankruptcy court found that the creditor had purchased a loan secured by the debtor's golf community for the purpose of acquiring the golf community. But *apart* from that issue, the court disallowed $136,883.79 of the $146,617.75 in attorney's fees requested by the creditor, finding that the creditor's actions in the case were overzealous, were not taken to protect its secured claim, were not cost justified, and were not those that a similarly situated creditor would have taken.[190]

In *In re Navient Solutions, LLC*,[191] the bankruptcy court addressed the reasonableness of attorney's fees awarded to a putative debtor under § 303(i).[192] The putative debtor sought attorney's fees in excess of $600,000.00, but the court found

---

[188] Doc. No. 304.

[189] 367 B.R. 858 (Bankr. M.D. Fla. 2007).

[190] *Id.* at 868-870.

[191] 627 B.R. 581 (Bankr. S.D.N.Y. 2021).

[192] Under § 303(i)(1), if the court dismisses an involuntary bankruptcy petition, it may award a reasonable attorney's fee and costs against the petitioning creditors and in favor of the alleged debtor.

that the requested fees were not reasonable for many of the reasons present here: overstaffing, duplication of services, block billing, and insufficient detail in the invoices.[193] In reaching its final award of $57,199.05, the court stated:

> The substantial reduction in fees in based on the various problems described above. No fees were awarded for numerous vague entries, and this Court has applied a further 50% reduction for overstaffing.[194]

Here, the Court is left with the clear impression that CCP—knowing that Heritage would ultimately be responsible for CCP's attorney's fees—embarked on an overly aggressive litigation strategy. Just as the bankruptcy court found in *Lake Diamond*, the Court here finds that CCP's actions were overzealous, were not taken to protect its secured claim, were not cost justified, and were not those that a similarly situated creditor would have taken. And as the bankruptcy court found in *Navient*, the Court finds that significant reductions in the requested fees are appropriate based on issues with A&P's invoices and overstaffing.

Having carefully reviewed A&P's invoices, and having considered the expert testimony and arguments of counsel, the Court concludes that a reasonable fee for CCP to protect and enforce its claim under § 506(b) is $49,531.60, as determined by Heritage's expert, Ms. Sherman. In addition, the Court will allow CCP's costs in the

---

[193] *In re Navient Solutions*, 628 B.R. at 592-593.
[194] *Id.* at 593.

amount of $4,866.15 as set forth in the CCP Claim, for a total award of attorney's fees and costs in the amount of $54,397.75.

### 3.    The Unpaid Principal Balance of the Heritage Loan as of the Petition Date

For several reasons, CCP's computation of the unpaid principal balance of the Heritage Loan is confusing. In Claim 27, Valley stated that the principal balance on the Heritage Loan—as of the October 21, 2019 Petition Date—was $5,642,281.86.[195] But CCP states that the unpaid principal balance—as of the projected September 16, 2020 closing date of the Ally Sale—was $5,424,442.41.[196]

CCP calculated this amount by (a) recomputing the principal balance as of the Petition Date by reallocating the payments that Heritage had made on the Heritage Loan for 16 months (from May 2018 to September 2019) between principal and interest, (b) calculating accrued interest—including default interest—commencing September 15, 2019, and (c) applying the Retail Proceeds received by Valley on January 9, 2020 to accrued interest—including default interest—and then to the principal balance.[197]

The Court's analysis starts with the unpaid principal balance of the Heritage Loan as of the Petition Date.

---

[195] Claim 27, Part 2, p. 1.
[196] Claim 35, Part 2, p. 3.
[197] CCP's Ex. 49, Doc. No. 469-19.

After reviewing the Valley Loan History and the 2014 Amortization Schedule,[198] the Court observes that Valley applied each payment it received from Heritage to principal and interest as though the payment had been received on its due date, even though nearly every payment was received after its due date. The Valley Loan History reflects that Heritage made its last "regular" payment of $40,216.84 on September 30, 2019, which Valley applied to the payment due on August 14, 2019. This resulted in an unpaid principal balance of $5,642,281.86,[199] which is consistent with Valley's October 2019 loan statement[200] and with Valley's Claim 27.

Shortly after CCP acquired the Valley Claims, it retained Dr. Steven Oscher[201] to "recalculate" the principal balance of the Heritage Loan. Starting with the payment due on April 14, 2018, Dr. Oscher calculated the interest that had accrued prior to the date on which each of Heritage's payments was made, and applied each payment, as directed by the 2014 Note, first to "accrued and unpaid interest" and then to principal.[202]

---

[198] Heritage's Ex. 111.e, Doc. No. 487-7, pp. 14-15; CCP's Ex. 24, Doc. No. 468-24, pp. 7-8.
[199] Heritage's Ex. 111, Doc. No. 487-1, Affidavit of Angela Morisco, ¶ 16; Heritage's Ex. 111.g, Doc. No. 487-9, p. 3.
[200] Heritage's Ex. 104, Doc. No. 473-6.
[201] Dr. Oscher is a Certified Public Accountant and holds Doctorate in Business Administration; he appears frequently in bankruptcy cases in the Middle District of Florida as a trustee and a forensic accountant.
[202] *See, e.g.*, CCP's Ex. 49, Doc. No. 469-19, p. 4.

According to Dr. Oscher, the "correct" unpaid principal on the Heritage Loan as of September 30, 2019, was $5,698,859.07,[203] an increase of $56,577.21 from the $5,642,281.86 stated by Valley in the Valley Loan History and Claim 27.

The issue before the Court is whether the CCP Claim, filed after the Claims Bar Date, is a permissible amendment to the Valley Claims.

The court in *In re Baker*[204] explained the analysis of post-bar date amendments as follows:

> According to the Eleventh Circuit Court of Appeals, amendments to claims are to be "freely allowed" when the purpose is to cure a defect in the claim as originally filed, describe the claim with greater particularity, or plead a new theory of recovery on the facts set forth in the original claim.

> It is therefore entirely possible "for a creditor to amend a timely filed claim . . . after the bar date." A claim filed after the bar date, however, must be carefully scrutinized to assure that a new claim is not being filed under the guise of an amendment. "In general, 'amendment is permitted only where the original claim provided notice to the court of the existence, nature, and amount of the claim and that it was the creditors' intent to hold the estate liable.'" (citations omitted).[205]

In other words, an amendment to a claim may be allowed after the claims bar date if the amendment simply cures a defect in the original claim or provides a new

---

[203] Doc. No. 299-2; CCP's Ex. 49, Doc. No. 469-19, pp. 4-7; Doc. No. 520, February 10, 2021 Trial Transcript, pp. 216-220.

[204] 2015 WL 13049756 (Bankr. S.D. Fla. May 5, 2015).

[205] *In re Baker*, 2015 WL 13049765, at *2 (citing *In re International Horizons, Inc.*, 751 F.2d 1213, 1216-17 (11th Cir. 1985), and *In re Jackson*, 482 B.R. 659, 664 (Bankr. S.D. Fla. 2012)).

theory of recovery on the same facts as the original claim.[206] But a post-bar date amendment will not relate back to a timely original claim if it states a new claim.[207]

In determining whether an amendment asserts a new claim, courts may look to whether the creditor is trying to go "beyond the perimeters of the original proof of claim and effectively file a 'new' claim that could not have been foreseen from the earlier claim," and may also look to the "degree and incidence of prejudice, if any, caused by the [creditor's] delay."[208] Finally, an amendment that arises from the same general agreement as the original claim may nevertheless constitute a new claim, if the amounts sought are based on a different set of facts.[209]

In *In re City of Capitals, Inc.*,[210] the assignee of a promissory note filed a timely proof of claim in a Chapter 11 case and, after the claims bar date, filed an amended claim that included late charges and default interest. When the debtor objected to the amended claim, the issue for the court was whether the claimant "as assignee on a note may assess the debtor certain late charges and penalty interest provided for under the note where the assignor bank did not elect to do so."[211]

---

[206] *In re Washington*, 420 B.R. 643, 646 (Bankr. W.D. Pa. 2009) (citations omitted).
[207] *Id.* at 645-46.
[208] *In re Mason*, 520 B.R. 508, 515 (Bankr. S.D. Miss. 2014) (quoting *In re Kolstad*, 928 F.2d 171, 175 n.7 (5th Cir. 1991)).
[209] *In re Marineland Ocean Resorts, Inc.*, 242 B.R. 748, 754-55 (Bankr. M.D. Fla. 1999) (Creditor's first claim sought to recover unpaid royalty fees under a franchise agreement; its post-bar date claim sought liquidated and treble damage for the debtor's alleged unauthorized use of trademarks.).
[210] 55 B.R. 634 (Bankr. D. Md. 1985).
[211] *Id.* at 635.

The court evaluated the issue in two parts: first, whether the note provided the assignee with a continuing right to recalculate the claim, and second, whether the debtor would be prejudiced by the amended post-bar date claim. The court first found that the loan documents stated that the note granted its holder the option to declare the unpaid principal and interest due in the event of default, and therefore authorized the assignee to recalculate the claim. Second, the court found that the debtor had sought refinancing using a "worst-case scenario" payoff figure that was only 3% less than the assignee's recalculated claim, and that the debtor therefore suffered no prejudice from the assignee's amended claim.[212]

Here, the 2014 Note, on which Claim 27 is based, directs that Heritage's payments be applied "first to accrued and unpaid interest [based on the actual number of days elapsed], second to principal and the balance, if any, to unpaid fees."[213] Although Valley did not follow that directive, it could have done so, and the 2014 Note specifically provides that "[n]o delay or omission on the part of Lender in exercising any rights hereunder shall operate as a waiver of such right or of any other right under this Note."[214]

The Court concludes that if Valley had amended Claim 27 after the Claims Bar Date, the amendment would not have gone "beyond the perimeters of the original

---

[212] *Id.* at 638-40.
[213] CCP's Ex. 24, Doc. No. 468-24, p. 3.
[214] *Id.*, p. 4.

proof of claim." Likewise, the CCP Claim, filed by CCP as Valley's assignee, does not go beyond the perimeters of Claim 27.

Next, the Court considers whether Heritage was prejudiced by CCP's post-bar date assertion of a greater starting principal balance than stated by Valley in Claim 27. The Court notes, first, Heritage has not asserted that Dr. Oscher's calculations are incorrect. And second, Heritage offered no evidence that it took any action in reliance on the principal balance stated in Claim 27, or that it would have acted differently had it known that the principal balance could be increased by $56,577.21. The Court finds that Heritage was not prejudiced by CCP's retroactive application of its payments as expressly provided for in the 2014 Note.

Accordingly, the Court concludes that, as of the Petition Date, the unpaid principal balance of the Heritage Loan was $5,698,859.07.

### 4.    Late Charges

In the CCP Claim, CCP asserts a claim for late charges totaling $75,058.35.[215] Heritage contends that the correct amount of late charges as of June 5, 2020, is $65,293.09 as stated in the Claim Assignment.[216] In its closing argument, CCP represented that after filing the CCP Claim, it recalculated the amount of late charges

---

[215] Claim 35, Part 2, p. 3.
[216] Doc. No. 471, p. 4; Heritage's Ex. 111.i, Doc. No. 487-10, p. 16.

due and they are now undisputed.[217] Accordingly, the Court will allow late charges in the amount $65,293.09.

### 5.    Oscher Consulting Fees

The CCP Claim includes $7,862.50 for "Oscher Consulting P.A. fees" that Dr. Oscher charged CCP to recalculate the principal and interest due on the Heritage Loan.[218] Heritage asserts that the entire amount should be disallowed because the calculations do not require the expertise of an accountant, particularly an accountant with Dr. Oscher's credentials.[219] The Court notes that the invoice from Oscher Consulting, P.A., indicates that services were performed by Dr. Oscher at the rate of $435.00 per hour and by Lisl Unterholzner at the rate of $340.00 per hour, and includes Dr. Oscher's charge of $1,631.25 for meeting with three A&P attorneys and preparing for and attending a hearing at which he did not testify.[220]

The Court has determined that the CCP Claim relates back to the filing of Valley's Claim 27, and that the unpaid principal balance on the Petition Date is $56,577.21 more than asserted by Valley. However, the Court finds that under § 506(b), it is not reasonable for CCP to charge the bankruptcy estate for the fees

---

[217] Closing arguments held on March 3, 2021.
[218] Claim 35, Part 2, p. 3, and Part 5, p. 61.
[219] Closing arguments held on March 3, 2021.
[220] Claim 35, Part 5, p. 61; CCP's Ex. 48, Doc. No. 469-18.

incurred in recalculating the amounts stated by Valley in Claim 27 and the Claim Assignment.

Further, Dr. Oscher's nine pages of alternate calculations were based on several different sets of assumptions, depending on the Court's determination of CCP's entitlement to default interest, the rate of default interest, and the date on which default interest accrued.[221] Calculations made prior to the Court's determination of these issues were not "necessary to the collection and protection" of the CCP Claim.

Finally, as Heritage asserts, the calculations performed by Dr. Oscher do not require the skill of a certified public accountant with Dr. Oscher's expertise, particularly in light of the ready availability of computers, Excel spreadsheets, and online interest calculators.

Accordingly, the Court will disallow the amount claimed by CCP under the Heritage Loan for the Oscher Consulting P.A. fees.

### 6.    CCP's Appraisal Fee

Heritage does not dispute the charge for an appraisal report obtained by Valley in April 2020. But in July 2020, CCP obtained and paid $10,000.00 for its own appraisal, and in August 2020 CCP paid the appraiser an additional $2,700.00 for "expert witness preparation."[222] CCP included both appraisal fees in the CCP Claim,

---

[221] CCP's Ex. 49, Doc. No. 469-19.
[222] Claim 35, Part 5, pp. 39-41.

in effect charging Heritage for two appraisals made within three months of each other.

Heritage asserts that CCP is not entitled to its duplicate appraisal fee, that CCP obtained its appraisal in connection with its effort to obtain the Hotel and not in connection with the preservation or enforcement of its claim,[223] and that $2,700.00 of the fee was charged by the appraiser, Ronald Oxtal, for his time spent waiting to be called as a witness at an August 25, 2020 Zoom hearing.[224]

In response, CCP contends that it did not receive Valley's appraisal until December 2020,[225] and that it needed an appraisal to evaluate its position as a secured creditor.[226] But CCP knew of Heritage's proposed sale to a third party for $10.5 million under the January 2020 Confirmation Order and it knew that Valley filed Claim 27 in February 2020 stating that the value of the Hotel was $10.5 million. CCP did not take the normal business step of obtaining an appraisal *before* the Claim Assignment, even though it now asserts that Heritage's valuation "is to be viewed askance."[227]

With respect to the $2,700.00 charged by Mr. Oxtal for waiting to called as a witness at a Zoom hearing, the Court finds, first, the August 25, 2020 hearing was not

---

[223] Doc. No. 471, p. 4.
[224] Due to the COVID-19 pandemic, all hearings in this case after March 2020 were conducted by Zoom.
[225] Doc. No. 520, February 10, 2021 Trial Transcript, p. 61.
[226] Doc. No. 505, pp. 34-35.
[227] *Id.*, p. 35.

noticed as an evidentiary hearing,[228] and second, Mr. Oxtal did not testify at the hearing.

For fees and costs to be reimbursable under § 506(b), they must be reasonable, meaning that they were necessary to the protection and enforcement of the creditor's claim.[229] Based on the record, the Court finds that the fees charged by CCP's appraiser are not reasonable and are disallowed

**7.    Summary of Amount Due on the Heritage Loan**

Under the 2014 Note, interest is calculated on a daily basis, and payments are applied first to accrued and unpaid interest, and then to the unpaid principal balance.

The Court finds that on the Petition Date, the unpaid principal balance of the Heritage Loan was $5,698,859.07. Heritage failed to pay the September 14, 2019 payment, or any payment thereafter. Accordingly, under the terms of the 2014 Note and the Third Party Lender Agreement, interest is calculated on the principal balance of $5,698,859.07 at the contract rate until September 25, 2019 (the eleventh day after Heritage failed to make the payment due on September 14, 2019). From September 25, 2019 to January 10, 2020 (the date of the application of the Retail Proceeds),[230] default interest accrued at the maximum rate posted by the SBA.

---

[228] *See, e.g.,* Doc. Nos. 272, 276, 277, and 278.
[229] *In re Digital Products Corp.,* 215 B.R. at 482.
[230] Heritage's Ex. 111, Doc. No. 487-1, Affidavit of Angela Morisco, ¶¶ 20-21; Heritage's Ex. 111.h, Doc. No. 487-9, p. 3.

The Retail Proceeds shall be applied to the accrued and unpaid interest and then to the unpaid principal balance of the Heritage Loan. If this application results in the reinstatement of the Heritage Loan, interest then accrued at the contract rate from January 10, 2020, until another loan default occurred, and then at the maximum default rate described above until the date that CCP received the proceeds of the Ally Sale in September 2020.

In addition, the Court allows the following amounts on the Heritage Loan component of the CCP Claim: late charges in the amount of $65,293.09; Valley's appraisal fee in the amount of $4,284.00; Valley's legal fees as of June 5, 2020, in the amount of $123,604.00; and CCP's legal fees and costs as of September 2, 2020, in the total amount of $54,397.75.

The Court will schedule a status conference to discuss finalizing the calculation of the balance due on the Heritage Loan with the parties.

### B.    The Glover Mortgage

In her affidavit, Angela Morisco describes the history of the Glover Mortgage in detail.[231]

In 2011, Mr. Glover obtained two loans from USAmeriBank in the amounts of $150,000.00 and $125,000.00 (respectively, the $150,000 Note and the $125,000 Note;

---

[231] Heritage's Ex. 111, Doc. No. 487-1, Affidavit of Angela Morisco, pp. 8-12, and Heritage's Exs. 111.o to 111.u, Doc. Nos. 487-16 to 487-22.

together, the "Glover Notes").[232] In 2011, Mr. Glover also delivered a Loan Agreement to USAmeriBank[233] and a Collateral Assignment to secure the Glover Notes.[234]

In June 2016, Heritage, Mr. Glover, USAmeriBank, and other parties entered into the Settlement Agreement[235] to resolve various disputes among them. As part of the Settlement Agreement, Heritage executed the Glover Heritage Note[236] in the amount of $270,000.00, and Mr. Glover executed the Glover Assignment in which he assigned the Glover Heritage Note to USAmeriBank as additional collateral for the Glover Notes.[237] In addition, Mr. Glover signed an Amended and Restated Collateral Assignment of Life Insurance Policy in which he assigned to USAmeriBank a life insurance policy as collateral for the Glover Notes (the "Glover Insurance Assignment").[238]

Ms. Morisco explains in her affidavit that when Mr. Glover failed to pay the Glover Notes upon their January 31, 2020 maturity date, Valley exercised its rights under the Glover Insurance Assignment to liquidate Mr. Glover's life insurance policy.[239] In May 2020 (months after Valley filed Claim 29), Valley applied $123,938.21

---

[232] Heritage's Exs. 111.k and 111.m, Doc. Nos. 487-12 and 487-14.
[233] Heritage's Ex. 111.o, Doc. No. 487-16.
[234] Heritage's Ex. 111, Doc. No. 487-1, Affidavit of Angela Morisco, ¶ 34. The Collateral Assignment is referred to in the Loan Agreement but is not in evidence.
[235] Heritage's Ex. 111.r, Doc. No. 487-19.
[236] Heritage's Ex. 111.t, Doc. No. 487-21, pp. 2-6.
[237] *Id.*, pp. 18-26.
[238] Heritage's ex. 111.u, Doc. No. 487-22.
[239] Heritage's Ex. 111, Doc. No. 487-1, Affidavit of Angela Morisco, ¶ 47.

of the insurance proceeds to pay the $125,000 Note in full and applied the remaining $28,232.99 of the insurance proceeds to the principal and interest owing on the $150,000 Note.[240] Ms. Morisco states that as of the date of the June 5, 2020 Claim Assignment from Valley to CCP, the remaining balance due on the $150,000 Note was $119,901.07.[241] In the Claim Assignment, Valley represented to CCP that $119,901.07 was due on the Glover Mortgage.[242]

However, in the CCP Claim, CCP claims $270,000.00 as the principal amount due on the Glover Heritage Note and Glover Mortgage and $170,322.15 of unpaid interest as of September 16, 2020, for a total amount due on the Glover Mortgage of $440,322.15.[243] CCP contends that the Glover Assignment was an absolute assignment and not a collateral assignment, that CCP is USAmeriBank's and Valley's assignee, and that CCP is therefore the holder of the Glover Heritage Note and entitled to collect the full amount owed by Heritage to Mr. Glover.[244]

But CCP's contention is refuted by two significant facts in the record. First, Valley represented to CCP in the Claim Assignment that the balance on the Glover Mortgage was $119,901.07 as of June 5, 2020.[245] Second, and more significantly, although the Glover Assignment does not expressly state that it is a collateral

---

[240] *Id.,* ¶¶ 48 and 49.
[241] *Id.,* ¶ 51.
[242] Heritage's Ex. 111.i, Doc. No. 487-10, p. 16.
[243] Claim 35, Part 2, p. 3.
[244] Doc. No. 505, pp. 31-34.
[245] Heritage's Ex. 111.i, Doc. No. 487-10, p. 16.

assignment, it states that it is being delivered pursuant to the terms of the Settlement Agreement, and the Settlement Agreement specifically provides that the "Glover Heritage Note shall act as additional collateral" to secure the Glover Notes.[246] Valley provided CCP with a copy of the Settlement Agreement in connection with the Claim Assignment.[247]

Whether a transaction is an absolute assignment or a collateral assignment is determined by the intent of the parties.[248] The parties to the Settlement Agreement included Mr. Glover and CCP's predecessor, USAmeriBank.[249] The Settlement Agreement states that the Glover Heritage Note is additional collateral for the Glover Notes. This clear statement of intent demonstrates that the parties did not intend for the Glover Assignment to be an absolute assignment or for USAmeriBank to acquire all of Mr. Glover's rights to enforce the $270,000.00 Glover Heritage Note.[250]

The Court concludes (1) that Mr. Glover assigned the Glover Heritage Note to USAmeriBank as additional collateral to secure his obligations to USAmeriBank on the Glover Notes, (2) that the remaining balance due on the Glover Notes as of June 5, 2020, was $119,901.07, and (3) that CCP, as USAmeriBank's assignee, may therefore recover the sum of $119,901.07, plus interest and fees due under the Glover Notes

---

[246] Heritage's Ex. 111.r, Doc. No. 487-19, p. 7, ¶ 8C. iv.
[247] *See* Heritage's Ex. 111.i, Doc. No. 487-10, p. 22 "George Glover Loan Delivery Documents," ¶ 32.
[248] *In re Radice Corp.*, 88 B.R. 422, 426 (Bankr. S.D. Fla. 1988).
[249] Heritage's Ex. 111.r, Doc. No. 487-19.
[250] *See St. Francis Holdings, LLC v. Pawnee Leasing Corp.*, 2020 WL 6746329, at *3 (M.D. Fla. Nov. 17, 2020).

since June 5, 2020, on account of the CCP Claim in Heritage's bankruptcy case, to be applied to the Glover Notes.

### C.    The Overdraft Claims

Valley originally filed Claims 30 and 31 for the Overdraft Claims as unsecured claims. CCP contends that, under the Heritage Loan Documents, the Hotel is security for "any additional indebtedness accruing to the Lender on account of any future payments, advances, or expenditures made by the Lender."[251] Consequently, in the CCP Claim—filed after the Clams Bar Date—CCP asserts that the Overdraft Claims are secured claims under the Heritage Loan Documents.

Heritage does not dispute the amount of the Overdraft Claims, but contends that they are unsecured claims as originally filed in Valley's Claims 30 and 31.[252]

In *In re Silva*,[253] the district court held that "it is the clearly established law of the Circuit and this District that attempts to change the status of a claim from unsecured to secured, or the like, after the bar date and confirmation of a plan, is a *new claim* that does not relate back to the original filing of the claim in a different classification."

---

[251] Claim 35, Part 2; CCP's Ex. 2, Doc. No. 468-2, pp. 2, 7.
[252] *See* Heritage's Ex. 88, Doc. No. 472-20.
[253] 2012 WL 2996742, at *5 (M.D. Fla. July 23, 2012) (emphasis added).

The Eleventh Circuit Court of Appeals similarly held in *In re International Horizons, Inc.*[254] that a new claim may not be filed in the guise of an amendment, and that amended claims may only cure a defect, describe the claim with more particularity, or plead a new theory of recovery on the facts set out in the original claim. And in *In re Las Uvas Valley Dairies*,[255] the bankruptcy court held that "[c]hanging an unsecured claim to a secured claim is tantamount to filing a new claim, and should not be permitted after the bar date."

The Court concludes that Valley filed the Overdraft Claims as unsecured, and that the CCP Claim was filed after the Claims Bar Date. CCP cannot amend Valley's claim to change the status of the Overdraft Claims from unsecured to secured. The Overdraft Claims are allowed as unsecured claims in the total amount of $83,563.42.

## III.    CONCLUSION

For the reasons set forth above, the Court finds that, as of the Petition Date, the unpaid principal balance of the Heritage Loan was $5,698,859.07. Interest on the unpaid principal balance accrued at the contractual rate until the eleventh day after Heritage failed to pay the payment due for September 14, 2019, and then at the maximum rate posted by the SBA until Valley applied the Retail Proceeds. The Retail Proceeds are applied first to the accrued and unpaid interest, and then to principal. If

---

[254] 751 F.2d 1213, 1216 (11th Cir. 1985).
[255] 620 B.R. 367, 374 (Bankr. D.N.M. 2020).

the Heritage Loan was reinstated upon application of the Retail Proceeds, interest accrued at the contractual rate on the reduced principal balance until eleven days after the next Event of Default, and then at the maximum rate posted by the SBA until CCP received payment from the proceeds of the Ally Sale.

In addition, the Court will allow the following on the Heritage Loan: late charges in the amount of $65,293.09; Valley's appraisal fee in the amount of $4,284.00; Valley's legal fees in the amount of $123,604.00; and CCP's legal fees and costs as of September 2, 2020, in the amount of $54,397.75. No amounts are allowed for the CCP appraisal fee or the Oscher Consulting P.A. fees.

The Court further finds that the amount of the CCP Claim based on the Glover Mortgage was $119,901.07 as of June 5, 2020, and that the Overdraft Claims are allowed as unsecured claims in the total amount of $83,563.42.

Accordingly, the Court will schedule a status conference to discuss the final calculation of amounts due on the Heritage Loan consistent with this Memorandum Opinion and will thereafter enter an order sustaining Heritage's Objection to the CCP Claim in part.

The Clerk's office is directed to serve a copy of this Memorandum Opinion on interested parties via CM/ECF.